**E-FILED**
Wednesday, 22 January, 2014  02:12:44 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JEREMY D. PALMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cv-3303 |
| | ) | |
| CAROLY W. COLVIN, Acting Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Jeremy D. Palmer appeals from the denial of his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.  42 U.S.C. §§ 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Palmer has filed a Brief in Support of Motion for Summary Judgment (d/e 12) (Palmer Brief), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 14).  The parties consented to have this case heard before this Court.  <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge to Exercise Jurisdiction and Reference Order entered April 10, 2013 (d/e 10)</u>.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

Palmer was born on June 8, 1972.  Palmer graduated from high school and completed a year of college.  He suffers from lumbago, patellofemoral syndrome, chronic dysthymia, obsessive compulsive disorder (OCD), anxiety and a history of posttraumatic stress disorder (PTSD).  Palmer previously worked as a kitchen helper, short-order cook, material handler, merchandise checker, and print shop helper.  R. 38, 41, 61, 88-89.

On December 2, 2008, Palmer went to see Dr. Nathan Seaman, D.O., for OCD.  Dr. Seaman prescribed Lexapro.  R. 330.  On March 20, 2009, Palmer saw Dr. Seaman.  Palmer reported that the Lexapro was helping.  R. 326.  On April 27, 2009, Palmer saw Dr. Seaman.  Palmer asked for an increase in the Lexapro dosage.  He reported that his wife told him he was irritable at times and has obsessive, repetitive motions and habits.  R. 325.

On June 16, 2009, Palmer applied for SSI.[1]  Palmer alleged that his disability began on December 13, 2003.  R. 175.  He later amended the onset date to September 30, 2007.  R. 59-60.

---

[1] On June 1, 2009, Palmer applied for Disability Insurance Benefits under Social Security Act 42 U.S.C. §§ 216(i) and 223(d).  Palmer amended his allegations at the hearing to allege an onset date of September 30, 2007.  R. 59-60.  Palmer's last day of insurability for Disability Insurance Benefits was

On June 26, 2009, Palmer saw Dr. Seaman.  Palmer complained of increasing symptoms of PTSD and anxiety.   Dr. Seaman noted that his depression was well controlled.  Dr. Seaman recommended counseling to address problems with anger management.  Dr. Seaman prescribed Lexapro, Klonipin, and Topamax for OCD, depression, anxiety, and PTSD. R. 323.

On July 30, 2009, Palmer went to Transitions of Western Illinois (Transitions or TWI) for counseling.  Palmer's case manager was Community Support Worker (CSW) Reta Webster, BSMHP.[2]  See R. 686. Webster established an Individualized Service Plan (ISP) for Palmer.  The ISP listed a Global Assessment of Functioning score (GAF) of 45 for Palmer.  R. 397.  The ISP was signed by Palmer, Webster, and Webster's supervisor, a licensed clinical professional counselor.  R. 397.  The ISP called for regular counseling to assist Palmer to control OCD behaviors, reduce depression and anxiety, and improve his ability to manage social activities.  R. 397-401.

On August 9, 2009, Transitions staff conducted a psychiatric evaluation of Palmer.  R. 394-96.  Upon completing the evaluation, Transitions did not accept Palmer for psychiatric services.  The reason is

March 30, 2007.  Therefore, the Administrative Law Judge (ALJ) determined that he was not eligible for Disability Insurance Benefits.  R.36. Palmer does not appeal this determination.
[2] The record does not explain the meaning of the designation "BSMHP".

not clear from the evaluation form.  R. 394-96.  Palmer, however, continued receiving counseling services from Transitions.

On August 14, 2009, Palmer saw Webster for counseling.  Palmer reported that he was involved in a court case in which a police officer was making false charges against him.  The pending court case was causing worry and anxiety.  He reported that he was coping well with this.  R. 403.

On August 17, 2009, Palmer went to see Dr. Seaman.   Palmer reported that he was involved in a severe traumatic experience as a result of an altercation in a pool hall that involved police.  He was required to appear in court.  Dr. Seaman adjusted Palmer's medications.  R. 379.

On September 9, 2009, Palmer saw state agency psychologist, Dr. Frank Froman, Ed.D., for a consultative examination.  R. 346-49. Palmer reported that he had been arrested for assaulting an officer and he spent four days in jail.  R. 347.  Palmer reported that he drove himself to the appointment.  He also reported that he took care of his own self-care and performed chores around the house.  R. 347.  Palmer told Dr. Froman that he had OCD, but it was not a significant problem because he knew the signs of "how to stop what he starts."  R. 348.  Dr. Froman opined that Palmer could:  perform one and two-step assembly jobs at a competitive rate; relate adequately to small groups of people; understand oral and

written instructions; and manage his benefits.  R. 348.  Dr. Froman also

opined that Palmer could withstand the stress associated with customary

employment.  R. 348.  Dr. Froman assigned Palmer a GAF score of 62.

R. 348.

On September 15, 2009, state agency psychologist Dr. Joseph Mehr,

Ph.D., prepared a Psychiatric Review Technique and Mental Residual

Capacity Assessment form.  R. 350-66.  Dr. Mehr opined that Palmer

suffered from affective disorders of mild dysthymia and bipolar disorder in

fair to good medical control, and anxiety-related disorders of OCD and

PTSD in remission.  R. 350-55.  Dr. Mehr opined that Palmer had mild

restrictions on activities of daily living; moderate difficulties in maintaining

social functioning; moderate difficulties in concentration, persistence, or

pace; and no episodes of decompensation.  R. 360.  Dr. Mehr commented,

"Based on the evidence of record, the claimant's statements are found to

be partially credible."  R. 362.  Dr. Mehr further opined that Palmer was

moderately limited in his ability to remember and carry out detailed

instructions, but otherwise not significantly limited in his functional abilities.

R. 364-65.  Dr. Mehr concluded, in relevant part:

> This gentleman is oriented, free of pertinent memory deficits, is
> independent in basic activities of daily living, and retains the
> cognitive capacity to remember work procedures, and to
> understand and remember instructions for simple operations of

a routine and repetitive type.  The claimant likewise retains attention and concentration that is sufficient to persist at and complete such operations for periods of time greater than several hours.  He also retains the capacity to maintain a schedule and be punctual.  He would not require special supervision.  He has sufficient pace and endurance to complete a normal workday and workweek, to perform at a consistent acceptable rate and he require (sic) only typical numbers and lengths of rest breaks.

The claimant retains the capacity to accept instruction and supervision.  He can relate appropriately with coworkers and peers without expressing unacceptable behavior.  This fellow retains the capacity for socially appropriate behavior, and he retains the capacity to deal appropriately with the general public and to do so in a service setting.

This claimant retains the capacity to adapt to changes in daily routines, and to be aware of and self-protective of common hazards.  He also retains the capacity to utilize public transportation to and from a place of work or to drive an auto to and from such a place.

R. 366.

On December 14, 2009, Palmer saw Dr. Seaman.  Palmer requested a change in his OCD medication.  Palmer reported that the OCD was getting worse.  Dr. Seaman observed on examination that Palmer was oriented as to person, place, and time, insight and judgment were intact and his affect was normal.  R. 483.

On January 27, 2010, Webster prepared a new ISP for Palmer. R. 545-48.  Webster assigned a GAF score of 45.  Webster stated that Palmer's symptoms were stable.  The ISP set goals for Palmer with respect to his OCD and anxiety.  R. 546-48.

On March 29, 2010, Webster prepared a form entitled "Medical Source Statement of Ability to do Work-Related Activities (Mental)" (MSS). R. 684-86.  Webster opined on this form that Palmer had mild restrictions on his ability to understand, remember, and carry out simple instructions; moderate restrictions on his ability to make judgments on simple work-related decisions and to understand and remember complex instructions; and marked restrictions on his ability to carry out complex instructions and to make judgments on complex work-related decisions.  R. 684.  Webster wrote,

> Mr. Palmer has diagnosis of Obsessive Compulsive Disorder—this has affected his decision making skills, he has a difficult time deciding what to do, changes his mind often about decisions.  Mr. Palmer experiences recurrent and persistent thoughts and impulses—these are intrusive and at times inappropriate and cause significant anxiety and distress for him—affecting his normal routine and all areas of functioning, including occupational.

R. 684.

Webster opined that Palmer had marked restrictions on his ability to interact appropriately with the public, supervisors, and coworkers; and moderate restrictions on his ability to respond appropriately to usual work situations and to changes in routine and work setting.  R. 865.  Webster stated the following as factors that supported her assessment,

> Mr. Palmer experiences symptoms related to diagnosis of Bipolar Disorder NOS, intense mood swings—periods of depression and mania, periods of paranoid thinking, irritable mood, short-tempered at times, problems with concentrating, feeling sad, down, depressed, hopeless, racing thoughts. Paranoid over the way others look at him has led to inappropriate behaviors in the public.

R. 685.  Webster stated that Palmer's disability began on September 30, 2007.  R. 685.  Webster signed the completed form along with Alan Obert, a licensed clinical social worker and Behavioral Health Coordinator at Transitions.  R. 686.

On April 19, 2010, Palmer saw Webster again.  Palmer reported that he lost his court case.  He reported that his sentencing date was in May.  He was worried about this.  He reported that the incident triggered increased anxiety and an increase in depressive symptoms.  R. 654.

On May 4, 2010, Palmer saw Dr. Seaman.  Palmer reported increased stress and panic attacks due to his upcoming sentencing. Dr. Seaman noted in the psychiatric portion of his examination that Palmer was oriented to person, place, and time; his insight and judgment were intact; and his affect was normal.  R. 561.

On May 10, 2010, Palmer saw Webster.  Palmer reported that he started taking anxiety medications.  He reported that the medication helped some and has reduced his OCD behaviors.  R. 656.  On May 26, 2010,

Palmer saw Webster.  Palmer reported that he was in a good mood.  He reported that he was placed on probation at his sentencing.  He reported less stress and a decrease in his anxiety and depressive symptoms.  He reported that he used art and drawing activities as positive coping activities.  R. 657.

On June 14, 2010, Palmer saw Webster.  Palmer reported that he had been feeling well lately.  His symptoms were low and manageable.  He reported a lower level of stress.  R. 658.

On July 9, 2010, Palmer saw Webster.  Palmer provided information for an assessment.  Webster stated that Palmer's symptoms were improved some compared to prior year.  R. 660.

On July 9, 2010, Webster completed an Adult Mental Health/DD Assessment form for Palmer.  R. 639-52.  The form was signed by Webster and her supervisors.  R. 651-52.  The assessment stated that Palmer's primary problems were OCD and anxiety.  R. 640.  The assessment stated that he had a pattern in which his symptoms would get better and then worse.  R. 639, 640.  The assessment assigned a GAF score of 45.  R. 649.  Webster checked a box on the assessment form indicating that Palmer was unemployed due to his mental illness and not due to any other causes.  R. 649.

Palmer did not make his appointments with Webster in July and August 2010.  R. 661-64.  On September 3, 2010, Palmer saw Webster. Palmer reported some progress on his goals set forth in his ISP.  R. 665.

On September 13, 2010, Palmer saw Webster.  Palmer reported that his anxiety was manageable.  He also reported a low stress level.  R. 667. On September 27, 2010, Palmer saw Webster.  Palmer reported that he was identifying social situations which were stressful and in which he felt high anxiety.  He reported that he was using relaxation skills, breathing and muscle relaxation, to help with his anxiety in those situations.  R. 668.

On November 1, 2010, Palmer started seeing a new Community Support Worker at Transitions, Grant Surpand.  Palmer reported that his back problems were triggering anxiety.  R. 671.  On November 9, 2010, Palmer saw Surpand.  Palmer reported that he was able to control his anxiety at a funeral.  R. 672.  On November 17, 2010, Palmer saw Surpand.  Palmer reported that he felt anxious at a store, but was able to control the anxiety and finish his activities at the store.  R. 673.

On November 22, 2010, Palmer saw Dr. Seaman.  R. 632-33.Palmer reported, "OCD is always there, --still seeing a counselor—difficult with change—but it's working well.  He comes to the house.  Has some issues with going outside and being in places with a lot of people."  R. 632.

Palmer also reported a "feeling of wanting to hit people" when he got anxious in public places "but would never do it". R. 632. Dr. Seaman found that Palmer was oriented to person, place, and time, that his insight and judgment were intact, and that his affect was normal. R. 633.

On December 3, 2010, Palmer saw Surpand. Palmer reported that he was doing a lot more and he has been using the information and techniques he had been learning at Transitions and "carrying them over when he is out." R. 675. On December 9, 2010, Palmer saw Surpand. Palmer reported that he was pleased with himself on how he handled his anxiety over the weekend. Surpand reported that Palmer "continues to try to get better." R. 676.

On February 23, 2011, Webster added a note to her MSS form. She stated, "Yes. These symptoms and impairments continue to be currently affecting Mr. Palmer." R. 686.[3]

On April 13, 2011, the ALJ conducted an evidentiary hearing in this case. R. 56-95. Palmer appeared in person and by his counsel.

---

[3] The parties refer to subsequent records from Transitions. R. 744-775. The record release form from Transitions indicates that these documents were released to Palmer's counsel on August 30, 2011, after the ALJ issued his opinion. Palmer has not sought a remand under sentence six of 42 U.S.C. § 405(g) to consider this new evidence. Therefore, these records are not relevant because they were not before the ALJ. See Eads v. Secretary of Dept. of Health and Human Services, 983 F.2d 815, 817-18 (7th Cir. 1993).

Vocational expert Matthew C. Lampley also appeared at the hearing by telephone.  R. 58.

Palmer testified first.  Palmer testified that he has been treated for OCD since July 2009.  R. 76.[4]  Palmer described his OCD.  He testified that he had rituals like returning to his residence three and four times to check the locks on the doors and the oven.  He testified that he brushed his teeth so extensively that he caused his gums to bleed.  He testified that he counted things, from tiles, papers, to the hairs on his arm.  He testified that he shaved his arm to stop counting the hairs on it. R. 76-77.  He testified that he could not work on an assembly line if an odd number of products were being placed into a box.  R. 81.

Palmer also testified that he had problems sitting and watching television.  He testified that he would become upset if the volume control was set on an odd number.  He testified that he would focus on shiny objects on the television screen and his mind would race.  R. 78-79.

Palmer testified that he also had racing thoughts at night.  The thoughts interfered with his sleep.  R. 84.  Palmer testified that generally he stayed awake twenty four hours straight about twice a week.  R. 85. Palmer

---

[4] Palmer also testified about his back problems.  R. 60-76.  The Court does not discuss this testimony because Palmer does not appeal the ALJ's determinations concerning his back problems or other physical limitations.

testified that the next day he would be extremely tired and would fall asleep anywhere.  R. 86.

Palmer also testified that his OCD interfered with his intimate relations with his wife.  The OCD also affected his ability to perform chores around the home.  R. 79.  Palmer testified that the OCD behaviors, such as rituals and counting, took up three and a half to four hours a day.  R. 80.

Palmer also testified that he had problems being touched.  Palmer testified that he got a feeling of "impending doom" when he was touched by strangers.  He testified, "I just get very anxious and fidgety and then I just get really nervous . . . ."  R. 81.  He testified that being touched by family or co-workers did not usually cause this reaction.  He testified, however, that one time he reacted severely when a co-worker came up from behind and gently tapped him on the shoulder, to the extent that the incident "almost ended the night.  Physically altercation (sic)."  R. 82.

Palmer testified that he avoided being around other people.  He testified that he felt "like I'm being watched, being noticed."  R. 82.  He testified that he seated himself in a public place, such as a restaurant, so he could see the entire room.  He wanted to prepare for any action by other people.  R. 82.

Palmer testified that he has missed work because of his psychological condition.  He testified that he could not go to work if he had not shaved his arms.  R. 83.  Palmer also testified that he has missed appointments because of his condition.  R. 83.

Vocational expert Lampley then testified.  The ALJ asked Lampley the following hypothetical question,

> I would like you to assume a younger individual, under the age of fifty, with a twelfth grade education, past work history that you've identified.  Assume that this hypothetical person could do light work, lifting and carrying twenty pounds occasionally, ten pounds frequently; standing and walking a total of six hours in eight, sitting a total of six hours in eight.  Let's say the person needed to change positions throughout for a minute or two every hour.  No ladders, ropes, or scaffolds.  The remaining posturals should be occasional.  That would be balancing, kneeling, stooping, crouch, crawling, climbing ramps and stairs, would all be occasional.  Okay, and then simple, routine tasks and let's say in a non-public setting.  So first of all, would such a person be able to do any of the past work?

R. 89.  Lampley opined that such a person could perform the Palmer's past merchandise checker job.  R. 89.  Lampley also testified that such a person could perform other jobs, such as:  a bench assembler, with 7,200 such jobs in Illinois and 622,000 such jobs nationally; and collator operator, with 2,100 such jobs in Illinois and 86,000 such jobs nationally.  Lampley testified that these two jobs were examples of the types of work that such a person could perform.  R. 90.

Lampley testified that a person in such jobs could not be off-task (except for normal, scheduled breaks) more than five minutes an hour in order to perform the listed jobs.  R. 91.  Lampley also testified that such a person could not be late or absent more than once in the first ninety days of work, ten times in the first year of work, and twelve times in the second year of work.  R. 91-92.

## THE DECISION OF THE ALJ

The ALJ issued his decision on July 21, 2011.  R. 36-47.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ determined that Palmer met his burden at Steps 1 and 2. He was not engaged in substantial gainful activity, and he had the severe impairments of lumbago, patellofemoral syndrome, mild chronic dysthymia, OCD, and a history of PTSD.  R. 38.  At Step 3, the ALJ found that Palmer's impairments, or combination of impairments, did not meet or equal a Listing.  R. 39.

At Step 4, the ALJ found that Palmer had the RFC to perform a limited range of light work.  The ALJ included in the RFC a limitation that Palmer could only perform "simple, routine tasks in a nonpublic setting." R. 40.  The ALJ added this last limitation to account for Palmer's mental impairments.  In reaching this decision, the ALJ relied on Dr. Froman's opinions.  The ALJ also cited references in the records from Transitions that indicated that Palmer was learning to cope with his OCD and anxiety, and making progress with his goals and objectives set in his treatment plans at Transitions.  The ALJ also cited some of Palmer's reported activities, such as being able to concentrate while playing video games. R. 43-44.

The ALJ limited Palmer to simple, routine tasks in a nonpublic setting in order to give some credit to Webster's MSS and Palmer's testimony. R. 44.  The ALJ, however, did not give controlling weight to Webster's opinions that Palmer had moderate limitations in making judgments and simple work-related decisions.  The ALJ explained,

> Ms. Webster is not a licensed psychologist or a psychiatrist, and so she is not any acceptable medical source for purposes of establishing a medical diagnosis.  There is no narrative explanation on the MSS in support of the moderate limitation checked off for even simple routine judgments.  Neither is there any support for that limitation in her actual treatment notes. The gaps in treatment, the self-reports of achieving control over OCD rituals to some medical sources, the relative lack of any

clinically noted mental status abnormalities, and the relative lack of strong psychotropic medications are all inconsistent with a moderate limitation even with making simple routine judgments. The claimant's admitted daily activities do not indicate moderate difficulties in making simple routine judgments. No other medical sources have indicated mental limitations severe enough to cause a moderate degree of limitation even with making simple routine judgments. Frank Froman, Ed.D., the consultative psychologist . . . might not have treatment experience with the claimant, but he did examine the claimant in person, and he is a license psychologist, unlike Ms. Webster. . . . Giving some weight to the claimant's subjective complaints, the undersigned had found a residual functional capacity somewhat more limited than Dr. Froman indicates. However, the preponderance of the evidence does not support a conclusion that the claimant has a moderate limitation even in making simple routine judgments.

R. 44-45.

The ALJ also found that Palmer's testimony about the severity of his mental symptoms was not totally credible in light of evidence in the medical record. The ALJ explained,

In regard to the claimant's mental health problems, his basic abilities to think, understand, communicate, concentrate, get along with family members, and handle normal work stress have never been significantly impaired on any documented long-term basis. There has been no documented serious deterioration in his personal hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, judgment or behavior patterns over any extended period. Furthermore, records from treating mental health specialists show the claimant admitted he had learned to recognize his OCD symptoms and had found ways to control them to such that he was able to continue with his normal daily activities. Their records further reflect the claimant's problems

with anxiety and OCD symptoms appeared to escalate when he
faced increased life stressors, rather than on a daily basis.
Also, their notes show the claimant missed and/or did not keep
scheduled appointments on several different occasions. The
undersigned notes that the claimant's testimony about OCD
rituals was vague.

R. 45.  In light of Palmer's RFC, the ALJ found at Step 4 that Palmer could

not perform his past relevant work.  R. 46.

At Step 5, the ALJ found that Palmer could perform a significant

number of jobs that exist in the national economy.  The ALJ relied on the

Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2,

and the testimony of vocational expert Lampley that Palmer could perform

the bench assembler and collator operator jobs.  R. 46-47.  The ALJ

concluded that Palmer was not disabled.

Palmer appealed the decision of the ALJ.  On September 12, 2012,

the Appeal Council denied Palmer's request for review.  The decision of the

ALJ then became the decision of the Defendant Commissioner.  R. 1.

Palmer then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  In making this review, the

Court considers the evidence that was before the ALJ.  Wolfe v. Shalala,

997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence. The opinions of Drs. Froman and Mehr support the ALJ's determination of Palmer's RFC at Step 4. The ALJ gave some credence to Palmer's testimony and Webster's opinions by limiting Palmer to simple, routine tasks in a nonpublic setting. The ALJ explained his basis for rejecting Webster's opinion that Palmer had moderate limitations in making simple work-related decisions. Webster's opinion was inconsistent with Dr. Froman's opinions and with the other evidence in the record. The ALJ further explained the basis for his credibility findings. The ALJ explained

that the medical evidence did not support Palmer's testimony about the severity of his condition.

In light of the RFC finding, the ALJ's findings at Steps 4 and 5 were supported by substantial evidence. The testimony of vocational expert Lampley, combined with the RFC finding, supported the finding that Palmer could perform a substantial number of jobs in the national economy. The decision is supported by substantial evidence.

Palmer argues that the ALJ erred by not giving Webster's opinions controlling weight. An opinion of a treating physician (or other acceptable medical source) regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). Acceptable medical sources include a medical or osteopathic physician, and a licensed psychologist, but not a community support worker. 20 C.F.R. § 404.1513(a). Therefore, the ALJ was not required to give Webster's opinions controlling weight.

Palmer argues that the ALJ should have given Webster's opinion controlling weight over Dr. Froman's opinions because she treated Palmer. Sometimes the opinions of healthcare professionals who are not acceptable medical sources should be given greater weight because they

may have more experience treating the person directly.  See SSR 06-03p.

In this case, the ALJ limited Palmer's RFC to simple, routine tasks in a

nonpublic setting in light of Webster's opinions and Palmer's testimony.

The ALJ gave some credence to her opinions.

The ALJ, however, rejected Webster's opinion that Palmer had

moderate difficulty making simple work-related decisions.  That finding is

supported by substantial evidence.  The opinions of Drs. Froman and Mehr

support that decision, as well as the other evidence cited by the ALJ which

indicates that Palmer was not so limited in his decision making abilities.

Palmer essentially asks this Court to reweigh the evidence and substitute

its judgment for that of the ALJ.  This is improper.  Delgado v. Bowen, 782

F.2d at 82.  The Court sees no error in the ALJ's consideration of

Webster's opinions.

Palmer also argues that the ALJ erred in his credibility determination.

Again, this Court will not review the credibility determinations of the ALJ

unless the determinations lack any explanation or support in the record.

Elder, 529 F.3d at 413-14.[5]  The ALJ again explained the basis for this

---

[5] Palmer asks the Court to follow persuasive authority in reviewing credibility determinations.  See Brief in Support of Motion for Summary Judgment (d/e 12) (Palmer Brief), at 13 (citing Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984)).  This Court declines Palmer's invitation.  The Court will follow the controlling authority from the Seventh Circuit Court of Appeals, as set forth in Elder and other opinions.

finding.  The medical record did not support Palmer's testimony about the severity of his symptoms.  For example, Palmer reported to Dr. Froman that he could recognize his OCD symptoms and control them.  R. 348. Thus, the credibility finding has support in the record.  The Court will not disturb it.  The Court, again, sees no error.[6]

Palmer cites persuasive authority that a GAF score of 50 or lower is evidence of disability.  Palmer Brief, at 14 n.2 (citing Pates-Fires v. Astrue, 564 F.3d 965 (8th Cir. 2009).  The Seventh Circuit has not adopted this position.  See e.g., Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010).  In any event, Dr. Froman assigned a GAF score of 62 to Palmer.  The ALJ stated that she relied of his opinions.  Dr. Froman's assessment of Palmer's GAF provides substantial evidence to support the ALJ's decision even considering GAF scores.

WHEREFORE Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 14) is ALLOWED, and Palmer's Brief in Support of Motion for Summary Judgment (d/e 12) is DENIED.  The decision of the Defendant Commissioner is AFFIRMED.

---

[6] Palmer mentions his testimony about his physical limitations briefly in his discussion of the ALJ's credibility finding.  Palmer Brief, at 13-14.  Palmer nowhere asserts any error in the ALJ's findings regarding his physical impairments.  This brief reference in his credibility argument is insufficient to preserve any issue on appeal regarding the ALJ's findings concerning physical impairments.

THIS CASE IS CLOSED.

ENTER:   January 17, 2014


                              _____*s/ Byron G. Cudmore*_____
                              UNITED STATES MAGISTRATE JUDGE